

15 38

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

FILED

OCT 23 2013

U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

UNITED STATES OF AMERICA, *ex rel.*
ROSEANNE WHOLEY,

              **Plaintiff/ Relator,**

Civil Action No.    **13-1538**

v.

UPMC, DONOHUE CARDIOLOGY
ASSOCIATES, and BRYAN C.
DONOHUE, M.D.

FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)

          **Defendants.**

## COMPLAINT FOR DAMAGES AND OTHER RELIEF
## UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3730)

### I.     INTRODUCTION

1.     This is an action by *qui tam* Relator Roseanne Wholey, in the name of the United

States Government, to recover penalties and damages arising from Defendants' submissions of

false and fraudulent billings to the United States Government, pursuant to the federal False

Claims Act ("FCA"), 31 U.S.C. § 3729-32, as amended.

2.     From at least April, 2011 through at least July 2012, and beyond, Defendants

made, or caused to be made, false claims and statements to various federally-funded medical

coverage programs, including Medicare, Medicaid, CHAMPUS, TRICARE, the Veterans

Administration in violation of the FCA. These claims revolve around unbundling, double billing,

miscoding, over-coding, up-coding and overutilization, as well as other improper billing

1

practices. Additionally, at least from 2007 to 2009, and thereafter Defendant UPMC made, or caused to be made, false claims and statements to various federally-funded medical coverage programs by falsely miscoding procedures that were not covered, in order to receive payment, in violation of the FCA.

3.      All claims for reimbursement submitted to a federally-funded healthcare program, as a consequence of the conduct described herein, constitute violations of federally-funded medical coverage program requirements regulations and guidelines and thus constitute false claims under the False Claims Act, 31 U.S.C. § 3729(a).

## II.      JURISDICTION AND VENUE

4.      This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims presented by Defendants to federally-funded healthcare programs.  This action arises under the provisions of Title 31, U.S.C. Section 3729, et sec. popularly known as the False Claims Act ("FCA" or "the Act") which provides that the United States District Courts shall have exclusive jurisdiction of actions brought under the Act.

5.      Section 3732(a) of the Act provides that "any action" under section 3730 may be brought in any judicial district in which a Defendant can be found, resides, transacts business, or in which any conduct proscribed by section 3729 occurred. One or more of the Defendants can be found, resides or transacts business in this judicial district, within the meaning of 31 U.S.C. § 3732(a).

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1395.

7.      Under the Act, this complaint is to be filed and remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders.  The government may elect to intervene and proceed with the action within sixty (60) days after it

receives both the complaint and the material evidence and information in support of the complaint.

### III.    PARTIES TO THE ACTION

8.    *Qui Tam* Plaintiff/ Relator, Rosanne Wholely ("Relator"), is a resident of the Commonwealth of Pennsylvania and brings this action on behalf of the United States of America.

9.    As required under the Act, 31 U.S.C. § 3730(b)(2), Relator has provided to the Attorney General of the United States and the United States Attorney for the Western District of Pennsylvania, simultaneous with the filing of this complaint, a statement of material evidence and information related to the complaint.  This disclosure statement supports the existence of the false claims submitted by the Defendants.

10.    Relator gained direct and independent knowledge of the Defendants' fraudulent submission of claims to federal health care programs for interventional radiology services and related hospital charges during the time that Relator's husband, Mark H. Wholey, M.D., worked at UPMC as an interventional radiologist, first as an employee of UPMC and then as an employee of Donohue Cardiology Associates. Roseanne Wholey assisted her husband in the administration and management of his practice, at all times material hereto, including but not limited to maintaining his medical records and documenting procedures for billing purposes.

11.    Before filing this action, Relator personally and/or through counsel voluntarily provided all material evidence and information of the Defendants' fraudulent practices and false claims to law enforcement offices, officials and agencies responsible for the oversight and enforcement of the claims in question.

12.    As of the date this action was filed, there had been no public disclosure of the

3

allegations that are the subject of this action, to the best of Relator's knowledge. Nevertheless, if any such allegations have been the subject of a prior public disclosure, the Relator is an original source of the information on which any such allegations are based, within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B).

13.     Defendant Bryan C. Donohue, M.D. ("Donohue") is an individual maintaining a cardiology practice with his principal office located at 50 Berry Road, Washington, PA 15301. At all times material hereto Defendant Donohue was an officer and principal shareholder of Donohue Cardiology Associates.

14.     Defendant Donohue Cardiology Associates ("DCA") is a professional corporation organized under the laws of the Commonwealth of Pennsylvania, in the business of providing cardiology services to residents in Western Pennsylvania at multiple locations in Allegheny and surrounding counties.

15.     Defendant UPMC is a Pennsylvania "nonprofit" corporation with its principal place of business in Pittsburgh, Pennsylvania. UPMC's website describes itself as "a 10 billion dollar integrated global health enterprise," operating more than 20 academic, community and specialty hospitals and 400 outpatient sites. UPMC, www.upmc.com (last visited August 12, 2013).

## IV.     BACKGROUND

### A.     The Medicare Program

16.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C.§§ 426, 426A.

17.     HHS is responsible for the administration and supervision of the Medicare Program.  The Centers for Medicare and Medicaid Services, (CMS) is an agency of HHS and is directly responsible for the administration of the Medicare Program.

18.     The Medicare Part B Program is a 100% federally subsidized health insurance system which includes medical treatment and services by physicians under 42 § U.S.C. 1395k(a)(2)(B).

19.     The United States provides reimbursement for Medicare claims from the Medicare trust fund through CMS. To assist in the administration of Part B of the Medicare Program, CMS contracts with "carriers." 42 § U.S.C. 1395u.  Carriers, typically insurance companies, are responsible for processing the payment of Part B claims to providers on behalf of CMS. *Id.*  Novitas Solutions, Inc. f/k/a Highmark Medicare Services ("Novitas") is the carrier responsible for processing the payment of Part B claims on behalf of CMS, including claims submitted by the Defendants.

20.     Pennsylvania providers claim Medicare Part B reimbursement from Novitas pursuant to written provider agreements. Novitas receives, processes, and pays or rejects those claims according to Medicare rules, regulations and procedures.

21.     According to the Medicare Benefit Policy Manual, Medicare will not reimburse for services which are not reasonable and not necessary. See Medicare Benefit Policy Manual Chapter 16 – Exclusions From Coverage, Section 20.

22.     Further, under federal health care programs, it is illegal to code or bill for services not actually rendered, provide medically unnecessary services, up-code bills, unbundle charges, submit duplicate billings or otherwise fail to follow established billing and coding guidelines.

23.    UPMC and DCA signed, or caused to be executed, provider agreements with Medicare that permitted both DCA and UPMC to submit claims and accept payment for services provided by DCA physicians.

24.    Medicare assigns to each participating provider a unique billing Provider Identification Number ("PIN").

25.    In submitting such Medicare claim forms, providers certify that the information included on the form presents an accurate description of the services rendered and that the services were medically necessary.

26.    In particular, the following language is included on CMS 1500 claim forms that are submitted to Medicare:

> "I certify that the services shown on this form were medically indicated and necessary for the health of the patient…"

27.    By participating in the computerized billing of Medicare claims, UPMC and DCA agreed to submit claims using CMS form 1500 and were aware of the required certifications.

28.    For procedures performed by physicians in a hospital setting, two types of claims for payment are submitted – one for the professional component (i.e., the costs associated with the physicians' time and labor) and the second for the technical component (the costs for any supplies and the facility's "overhead.")

### B.    The Medicaid Program

29.    Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal involvement in Medicaid is largely

limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

30.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called Federal Financial Participation (FFP). 42 U.S.C. §§ 1396, *et seq*.

31.     The state directly reimburses physicians for services rendered, with the state obtaining the federal share of the payment from accounts, which draw on funds of the United States Treasury. 42 C.F.R. §§ 430.0-430.30. The federal share of each state's Medicaid program varies state by state.

32.     The Commonwealth of Pennsylvania participates in the Medicaid Program, through its Department of Public Welfare ("DPW"), the state agency responsible for administering the Medicaid Program.

33.     At all times relevant to the complaint, the United States provided federal funds to Pennsylvania and its DPW through the Medicaid program, pursuant to Title XIX of the Social Security Act 42 U.S.C, §§ 1396 et seq. Enrolled providers of medical services to Medicaid recipients, including each of the Defendants, are eligible for reimbursement for covered medical services under the provisions of Title XIX of the 1995 Amendments to the Federal Social Security Act. By becoming a participating provider in Medicaid, enrolled providers, including each of the Defendants, agree to abide by the rules regulations policies and procedures governing reimbursement, and to keep and allow access to records and information by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures promulgated by DPW.

34.     Applicable provisions of 42 CFR, Chapter 4, Subpart D, and other applicable federal statues, provide for payments for physician services and providers and facilities providing physician services, including Defendants, as long as such services were medically indicated, necessary to the health of the patient, and certified as required by Medicare and Intermediary rules.

### C. The TRICARE/ CHAMPUS Program

35.     TRICARE, formerly known as CHAMPUS, established by 10 U.S.C. §§ 1071-1110, is a federally-funded program, administered by the Secretary of Defense. It provides medical benefits, including hospital services, to (a) the spouses and unmarried children of (1) active duty and retired service members, and (2) reservists who were ordered to active duty for thirty days or longer; (b) the unmarried spouses and children of deceased service members; and (c) retirees.

36.     The regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual healthcare professional) (citing U.S.C.§1395, *et seq*.) Services and supplies that are not medically or psychologically necessary for the diagnosis or treatment of a covered illness or injury are specifically excluded from coverage. 32 C.F.R. § 199.4(g)(1).

37.     TRICARE prohibits improper billing practices such as unbundling, fragmenting, code gaming, and duplicate billing as a means of manipulating CPT codes to increase reimbursement. 32 C.F.R. § 199.9(c). Such practices are considered fraudulent and abusive and a misrepresentation of services. 32 C.F.R. § 199.9(c)(5)-(c)(8).

**D.**     <u>**Medical Coding**</u>

38.     The American Medical Association assigns and publishes numeric codes, known as Current Procedural Terminology (CPT) and Health Care Financing Administration Procedure Coding System (HCPCS) codes. The codes are a systematic listing of procedures and services performed by healthcare providers. They include codes for cardiology and radiology and related services, based on complexity, supervision, and documentation requirements. Health care providers and healthcare benefit programs use CPT and HCPCS codes to describe and evaluate the services for which they claim, and to decide whether to issue or deny payment. Each healthcare benefit program establishes a fee reimbursement for each procedure described by a CPT or HCPCS code.

39.     Each year Medicare publishes a Physician's Fee Schedule in which all of the CPT codes are listed, together with the reimbursement Medicare allows for each code. Medicare lists the amount of reimbursement paid in the facility setting (i.e. hospital) and a non-facility setting (i.e. office).

40.     As a condition of participation in the Medicare Part B program, providers agree to be familiar with, and abide by, the program's reimbursement policies. In particular, DCA and UPMC certified to the following requirements when they first applied for Medicare enrollment:

> (3) I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-kickback statute and the Stark law), and on the suppliers compliance with all applicable conditions of participation in Medicare.

(5) I agree that any existing or future overpayment made to the supplier by the Medicare program may be recouped by Medicare through the withholding of future payments.

(6) **I will not knowingly present were caused to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.**

(emphasis added)

41.       Accordingly, DCA and UPMC had a duty to be knowledgeable of the statutes, regulations and guidelines regarding coverage for Medicare services, which include the policies relevant to billing cardiology, radiology and related services.

42.       DCA and UPMC certified that they were knowledgeable about Medicare's requirements in the provider enrollment forms submitted.

43.       Medicare covers, and participating providers agree to submit claims, only for services that are medically necessary to diagnose and treat illness or injury, and for which the provider maintains adequate supporting documentation, for example, physicians orders, medical necessity notes, and other pertinent documentation justifying the treatment administered. 42 USC § 1395y(a)(1)(A).

44.       In short, in order for Defendants to be properly reimbursed for patient care by the Medicare program, CMS requires that the treating physician ordered the applicable services and appropriately documented justification and administration of those services. The provider can submit only those codes that correlate with the notes made by the physician in the medical record and the provider must adhere to coding guidelines when assigning applicable codes.

E.       **Overview of Interventional Radiology Procedures**

45.       Interventional radiologists, like cardiologists, neurologists, and vascular surgeons are consulted to evaluate blockages of non-coronary arteries, such as carotid arteries

(the arteries that run through the neck and carry blood from the heart to the brain), renal arteries (arteries that feed the kidneys), and peripheral arteries (any non-coronary, non-carotid, and non-renal artery, usually referring to arteries in the legs).  Carotid, renal, and peripheral arteries may be diagnosed and treated in a fashion similar to coronary arteries, including with angiograms, angioplasty and stents (PCI).

46.     Invasive testing and treatment includes catheterization and surgical procedures. Catheterization is a procedure where a thin, flexible tube (the catheter) is inserted over a wire into the peripheral arteries/ veins to identify areas of stenosis or thrombosis.

47.     Catheters are also used to inject dye into the arteries in an invasive x-ray procedure known as an angiogram.  This x-ray test will determine how many blockages are present, where the blockages are located, and how severe they are.  The angiogram will guide the decision on whether or not revascularization with stenting or surgery is needed.

48.     Angioplasty is an invasive procedure used to restore blood flow through a narrowed artery. First, a catheter is inserted into the artery. The catheter has a small balloon attached to its tip, and is guided into the part of the artery that is narrowed due to a buildup of plaque. The balloon is filled with air to push the plaque against the artery wall.

49.     Often, the balloon tipped catheter will have a stent (a wire mesh cylinder used to keep the artery propped open and unblocked) mounted on a balloon.  To place a stent in the artery, the balloon is inflated and filled with air to expand the stent and push the plaque against the artery wall. The stent is then left in the patient's body to help support the artery wall.

50.     Atherectomy is a minimally invasive surgical method of removing plaque from blood vessels.  A physician uses a specialized catheter with a sharp rotating blade, grinding bit, or laser filament as well as a collection system to collect or suction debris.  This procedure is

11

typically used to treat significantly hardened blockages where angioplasty and/or stenting cannot be performed.  By removing the blockage it allows more blood to flow within the vessel.

## V.     IMPROPER CONDUCT OF DEFENDANTS

51.     Relator, Roseanne Wholey is a medical/billing consultant with more than 30 years of experience in medical practice management and has extensive knowledge in third-party billing including, coding and reimbursement regulations and practices. She has particular expertise in coding of peripheral vascular and coronary interventions.

52.     Relator's husband, Mark H. Wholey, M.D. ("Dr. Wholey"), is an interventional radiologist, and at all times relevant hereto, was employed by UPMC or DCA. During the period from January 2011 through July 2012, Dr. Wholey was employed by DCA and was assigned to provide medical services to patients at DCA's office at UPMC Shadyside. During the period from July 2007 through July 2009, Dr. Wholey was employed directly by UPMC.

53.     At all times relevant hereto, Relator assisted her husband in the administration of his business affairs, including but not limited to maintaining medical records and documenting procedures for billing purposes. Because of her particular expertise, Relator was in a unique position to audit the coding and billing practices of DCA and UPMC as they related to the billing for services rendered by her husband.

54.     As discussed in more detail below, Relator discovered patterns of improper billing that demonstrate a fraudulent scheme by DCA and UPMC to overcharge for interventional radiology services provided by DCA physicians and others performing such services as employees or contractors at UPMC facilities.

**A.**     **Fraudulent Billing Under the DCA Affiliation Agreement**

55.     In January, 2011, Mark H. Wholey, M.D. was hired by DCA as an interventional and vascular radiologist pursuant to an "Affiliation Agreement" (the "Agreement") effective January 1, 2011.

56.     The Agreement provided that DCA was responsible for billing and collecting reimbursements for professional services on behalf of Dr. Wholey.

> "...Physician agrees that DCA shall bill for and collect all reimbursement for all professional services performed by the Physician [Wholey] and agrees that DCA will use the same billing and collection processes for Physician's professional services as DCA uses for its own practice....Physician shall cooperate in the billing and collection activities by, among other things, maintaining charts and records in accordance with applicable legal and professional standards and in accordance with DCA policies and payer requirements, by providing support and explanation for billing and claims to third party payers if necessary..."

57.     While DCA's practice manager Maria Donohue oversaw the billing functions at DCA, the day to day coding and reimbursement activities were handled through UPMC's Physician Services Division, coordinated by a shared-employee liaison, Judy Hall.

58.     Following each procedure performed, Dr. Wholey and other DCA "affiliated" physicians, and presumably all physicians utilizing UPMC's billing services, dictated their operative reports into UPMC's inter-hospital dictation system.

59.     Each transcribed report then fell into a cue where it was picked-up by the centralized billing office which serviced all UPMC facilities and physicians.

60.     Coders in the UPMC centralized billing office assigned CPT codes based upon the information derived from the physician's operative report.

61.     Each code uniquely identifies the specific medical service(s) rendered and corresponds to an amount of reimbursement that is owed to the provider. For this reason, the

financial integrity of all federally funded healthcare programs depends upon the correct usage of the coding system.

62.     After each CPT code was assigned in the centralized billing office, the relevant billing data was "exploded," generating bills for both DCA, for the physicians service, and for UPMC, for the facility or technical component charges. The bills were then submitted electronically to various payors, including federal health care programs.

63.     Between March 30, 2011 and August 8, 2011 Relator provided technical coding assistance to DCA and UPMC to insure that her husband's interventional radiology services were properly billed.

64.      Despite the assistance provided by Relator, DCA and UPMC limited Relator's participation in the billing process after August 8, 2011. After August 8, 2011, Defendants precluded Relator from providing coding advice, but allowed her to monitor the billing "after the fact", by providing to her accounts receivable reports periodically.

65.     The accounts receivable reports disclosed that DCA and UPMC routinely engaged in unbundling, over-coding and up-coding, resulting in duplicate billing and other overcharges to the federal healthcare programs.

66.     Over a period of several months Relator questioned and challenged Defendants' misuse of certain codes and combinations of codes.  Despite the Relator's warnings and admonitions, DCA and UPMC insisted that their coding was correct and persisted in their scheme to overcharge payors, including the federal healthcare programs.  Not only did Defendants reject Relator's coding guidance, they prohibited her from personally contacting the DCA office to discuss coding issues.

67.    While the examples cited below were drawn from her husband's records, Relator believes that the fraudulent billing practices uncovered were not unique to billings prepared and submitted on behalf of her husband, but rather were representative of all claims submitted by Defendants on behalf of DCA physicians.  The Affiliation Agreement between Dr. Wholey and DCA provided in relevant part;

> "…DCA will use the same billing and collection processes for Physician's [Dr. Wholey's] professional services as DCA uses for its own practice…"

68.    Indeed, because DCA subcontracts the actual coding and billing functions to UPMC, Relator believes the aforesaid fraudulent billing practices employed were pursuant UPMC's system-wide policy, extending beyond DCA to other interventional radiologists, cardiologists, neurologists, or vascular surgeons that are employed by UPMC or whose services are billed by UPMC pursuant to contract.  To the extent that these other physicians were performing and billing similar procedures, it is reasonable to expect the same coders at UPMC employed the same improper coding procedures, resulting in fraudulent bills from all of the interventional radiologists, cardiologists, neurologists, or vascular surgeons throughout the UPMC system.

*Up-Coding and Unbundling of Lower Extremity Codes CPT Codes 37220 to 37235*

69.    As described in the AMA manual of CPT Codes, Codes 37220 to 37235 are to be used to describe lower extremity endovascular revascularization services performed for occlusive disease.  Because these codes are built on progressive hierarchies with more intensive services inclusive of lesser intensive services, "the code inclusive of the most intensive services provided" should be used.  "Only one code from this family (37220-37235) should be reported for each lower extremity vessel treated."

15

70.     In her review of DCA's operative reports for services performed by her husband, Roseanne Wholey discovered that the UPMC coders repeatedly billed for both the most intensive services <u>and</u> the included lesser intensive services.  In many of the cases the most intensive services are up-coded and a more costly procedure is charged.

71.     In particular, in those cases in which DCA physicians were performing interventions in the iliac, femoral/popliteal, tibial/peroneal territories, the UPMC coders should have used a single code for the most intensive service.  Each such code <u>includes</u> the work of accessing and selectively catheterizing the vessel, traversing the lesion, radiological supervision and interpretation directly related to the interventions performed, embolic protection if used, closure of the arteriotomy by pressure and application of an arterial closure device or standard closure of the puncture by suture, and imaging performed to document completion of the intervention in addition to the intervention(s) performed.

72.     Rather than correctly coding for the more intensive procedure, as mandated by the AMA CPT codebook, the UPMC coders incorrectly and fraudulently "unbundled" and billed for both the most intensive service and the included selective catheterization and/ or  radiological supervision and interpretation directly related to the interventions performed.

73.     For example, in the case of J.R., UPMC coders billed Medicare for a femoral/popliteal atherectomy (CPT code 37225) for a procedure that was performed by Dr. Wholey on October 4, 2011.  In fact, according to the operative report, no atherectomy was performed. Rather, Dr. Wholey performed a stent procedure and it should have been billed under CPT code 37226.

74.     In addition to incorrectly coding the service provided, the UPMC coders billed for a selective second order catheter placement (CPT code 36246), which should have been

included in the work of the more intensive service, the atherectomy (as coded) or stent (as actually performed). The coders also overcharged for an aortogram *with run-off*, coding it as CPT 75630, rather than CPT 75625 (aortogram *without run-off*).

75.    Another example is the case of W.B., a Medicare patient that underwent a stent procedure performed by Dr. Wholey on October 10, 2011.  This service was improperly coded as a femoral/popliteal atherectomy (CPT code 37225) by the UPMC coders.

76.    In addition to incorrectly coding the service provided to W.B., the UPMC coders unbundled and improperly charged the Medicare program for catheterizations that were already included in the more intensive service, the atherectomy (as coded) or stent (as actually performed).

77.    Finally, Medicare was billed for a renal angiogram (CPT code 75724), even though there is no indication in the operative report that Dr. Wholey performed a renal angiogram on WB.

78.    Another example is the case of N.S., a Medicare patient treated by Dr. Wholey on October 11, 2011.  Again, the UPMC coders billed CPT code 37225, incorrectly claiming reimbursement for an atherectomy when the operative record clearly indicates that Dr. Wholey performed a stent procedure.

79.    In addition to incorrectly coding the service provided to N.S., UPMC unbundled and charged for a catheter placement (CPT code 36246) as well as a pre-procedure angiogram (CPT code 75710).  In this case, the only code that should have been billed was CPT code 37226.

80.     Another example is the case of H.C., also a Medicare patient treated by Dr. Wholey on January 17, 2012.  Again, the UPMC coders billed code 37225 for an atherectomy when the operative record clearly indicates that Dr. Wholey performed a stent procedure.

81.     In addition to incorrectly coding the service provided to H.C., UPMC unbundled and charged for catheter placements (CPT code 36246, 36247 and 36248).  The coders also overcharged for an aortogram *with run-off*, coding it as CPT 75630, rather than CPT 75625 (aortogram *without run-off*).

*Unbundling of Carotid Stenting Code CPT code 37215 and 37216*

82.     As described in the AMA manual of CPT Codes, Codes 37215 and 37216 are to be used to describe transcatheter placement of intravascular stents, cervical carotid artery, percutaneous; with distal embolic protection (37215) and without distal embolic protection (37216).

83.     As with the lower extremity endovascular revascularization services referenced above, codes 37215 and 37216 are built on progressive hierarchies with more intensive services inclusive of lesser intensive services, "the code inclusive of the most intensive services provided" should be used. The instructions in the manual are clear;

> "[CPT codes] 37215 and 37216 include all ipsilateral selective
> carotid catheterization, all diagnostic imaging for ipsilateral,
> cervical and cerebral carotid arteriography, and all related
> radiological supervision and interpretation. When ipsilateral
> carotid arteriogram (including imaging and selective catheterization)
> confirms the need for carotid stenting, 37215 and 37216 are
> inclusive of these services. If carotid stenting is not indicated,
> then the appropriate codes for carotid catheterization and
> imaging should be reported in lieu of 37215 and 37216"
> (*emphasis added*).

84.     In her review of DCA's operative reports for services performed by her husband,

Roseanne Wholey discovered that the UPMC coders repeatedly billed for both the most intensive services <u>and</u> the included lesser intensive services.

85.     For example, Dr. Wholey performed a carotid artery stent procedure on Medicare patient C.C. on December 16, 2011.  UPMC coders correctly billed Medicare for this procedure as the most intensive service under CPT code 37215, but improperly unbundled and additionally billed for catheterizations under CPT codes 36215 and 36218. They also improperly billed for radiological supervision and interpretation codes 75665 and 75676.

86.     In another example, Dr. Wholey performed a carotid artery stent procedure on Medicare patient J.C. on February 28, 2012. UPMC coders correctly billed Medicare for this procedure as the most intensive service under CPT code 37215, but improperly unbundled and additionally billed for a second order upper extremity catheter placement under CPT code 36216. They also improperly billed for radiological supervision and interpretation codes 75665 and 75676.

87.      In a slight variation from the prior two examples, Dr. Wholey performed a carotid angioplasty on Medicare patient S.S. on December 23, 2011.  UPMC coders incorrectly billed Medicare for this procedure under CPT code 37215 even though the operative record clearly indicates that no carotid stent was deployed.  They improperly unbundled and additionally billed for inclusive selective first-order upper extremity catheter placement codes 36215 (twice) and 36216, as well as a non-selective catheter placement code CPT 36200. They also improperly billed for radiological supervision and interpretation codes 75650 (twice) and 75676 (three times).

*Unbundling of Renal Angiogram Codes CPT Codes 36251-36254*

88.     As described in the AMA manual of CPT Codes, Codes 36251 to 36254

19

are to be used to describe diagnostic Renal Angiography.

89.     As with the lower extremity endovascular revascularization services and carotid stenting services referenced above, codes 36251 to 36254 are built on progressive hierarchies with more intensive services inclusive of lesser intensive services, "the code inclusive of the most intensive services provided" should be used. When these new codes were introduced in 2012 the instructions in the manual clearly stated;

> The new renal angiogram codes, 36251-36254, include moderate sedation, arterial access and catheter placement, contrast injection(s), flouroscopy, flush aortogram, image postprocessing, permanent images recording and radiological supervision and interpretation (RS&I). Therefore, it is not appropriate to report these services separately.

90.     Roseanne Wholey's review disclosed that UPMC coders repeatedly billed for both the most intensive services <u>and</u> the included lesser intensive services.

91.     For example, Dr. Wholey performed a comprehensive renal angiogram on Medicare patient P.C. on January 3, 2012 that was billed under CPT code 36252.  The UPMC coders incorrectly reported the first order lower extremity catheter placement codes as additional charges under CPT code 36545.

92.     In another example, Dr. Wholey performed a selective left renal angiogram procedure on Medicare patient P.H.C. on January 24, 2012. This procedure should have been billed under CPT code 36251. Instead, UPMC coders incorrectly billed Medicare for this procedure as a stenting procedure when no stent service was performed.  In addition to miscoding the most intensive service, they also improperly unbundled and additionally billed for a second order lower extremity catheter placement under CPT code 36246 and an abdominal aortogram under CPT code 75625 .

**B.**     **Fraudulent Billing Bracheocephalic PTA Code 35475**

93.     Prior to his employment with DCA, during the period from July 2007 through 2009, Dr. Wholey was employed as an interventional radiologist at the Department of Interventional Radiology at UPMC Shadyside.

94.     During the time that he was employed by UPMC, all of the billing for services performed by Dr. Wholey were handled by UPMC's billing department.   Dr. Wholey and Relator, would periodically review the billing records to confirm whether the services were being properly and accurately billed.

95.     On multiple occasions Dr. Wholey and Relator noticed that certain carotid procedures did not meet the criteria for CPT codes 37215 and 37216, and therefore were not covered. These procedures were routinely and repeatedly mischaracterized as brachiocephalic PTA procedures and improperly billed under CPT code 35475 (with a supervision and interpretation CPT code 75962).

96.     Alternatively, on some occasions procedures that did not meet the narrow criteria for a carotid stent were improperly billed under other non-carotid stenting codes (i.e., 37205 and 75960).

97.     Despite repeated complaints by Dr. Wholey and Relator, hospital administrators insisted that the UPMC coders were correctly billing the carotid procedures and refused to change their billing practices.  Relator believes the aforesaid fraudulent billing practices were pursuant UPMC's system-wide policy, extending to other interventional radiologists that are employed by UPMC or whose services are billed by UPMC pursuant to contract.

## VI.    THE FALSE CLAIMS ACT

98.    The False Claims Act, 31 U.S.C. §§ 3729-33, provides for the award of treble

damages and civil penalties for, *inter alia*, knowingly causing the submission of false or

fraudulent claims for payment to the United States Government and for making or using false

statements material to false or fraudulent claims paid by the United States. 31 U.S.C.

§§  3729(a)(1), (2); 31 U.S.C. §§  3729(a)(B) (May 2009). The False Claims Act (FCA), as

amended, provides in pertinent part that:

> (1) Any person who (A) knowingly presents, or causes to be
> presented, a false or fraudulent claim for payment or approval; (B)
> knowingly makes, uses, or causes to be made or used, a false
> record or statement material to a false or fraudulent claim; (C)
> conspires to commit a violation of subparagraph (A), (B), (D), (E),
> (F), or (G); . . . or (G) knowingly makes, uses, or causes to be
> made or used, a false record or statement material to an obligation
> to pay or transmit money or property to the Government, or
> knowingly conceals or knowingly and improperly avoids or
> decreases an obligation to pay or transmit money or property to the
> Government,
>
> * * *
>
> Is liable to the United States Government for a civil penalty of not
> less than  $5,000 and not more than $10,000, as adjusted by the
> Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.
> C. 2461 note: Public Law 104-410), plus 3 times the amount of
> damages which the Government sustains because of the act of that
> person . . ..
>
> (b) For purposes of this section, the terms  "knowing" and
> "knowingly" mean that a person, with respect to information (1)
> has actual knowledge of the information; (2) acts in deliberate
> ignorance of the truth or falsity of the information; or (3) acts in
> reckless disregard of the truth or falsity of the information, and no
> proof of specific intent to defraud is required.

31 U.S.C. § 3729.

## VII.   DAMAGES

99.     The United States was damaged because of the acts of the Defendants in submitting or causing to be submitted false claims and statements in that the United States paid the Defendants for services for which they were not entitled to reimbursement.


## COUNT ONE

### Federal False Claims Act 31 U.S.C. § 3729(1)(A)

100.     Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 99 of this complaint.

101.     This is a claim for treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

102.     By means of the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the United States.  The United States, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

103.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.


## COUNT TWO
### Federal False Claims Act 31 U.S.C. § 3729(1)(B)

104.  Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 103 of this complaint.

105.    This is a claim for treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

106.    By means of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).  The United States, unaware of the falsity of the records and statements, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

107.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT THREE
### Federal False Claims Act 31 U.S.C. § 3729(1)(C)

108.    Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 107 of this complaint.

109.    This is a claim for treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

110.    By means of the acts described above, Defendants conspired to defraud the United States by getting false or fraudulent claims allowed or paid.  The United States, unaware of the conspiracy, and unaware of the falsity of the records, statements and claims made, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

111.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## CONCLUSION

112.    The Defendants are liable to the United States Government for civil penalties and treble damages, pursuant to 31 U.S.C. § 3729(a).  In addition, the Plaintiff/ Relator is entitled to recover reasonable expenses, attorney's fees, and costs incurred in prosecuting this action, pursuant to 31 U.S.C. § 3730(d).  Further, the Plaintiff/ Relator is entitled to a share of the recovery obtained by the United States as a result of this action, pursuant to 31 U.S.C. § 3730 (d).

WHEREFORE, Plaintiff/ Relator prays that upon trial or final hearing the Court grant judgment for Plaintiff/ Relator and the United States against the Defendants, as follows:

      a.   For civil penalties of $5,500 to $11,000 for each false claim pursuant to 31 U.S.C. § 3729(a);

      b.   For three times the amount of damages proved, pursuant to 31 U.S.C. § 3729(a);

      c.   For costs of court;

      d.   For pre-judgment and post-judgment interest at the rates permitted by law; and

      e.   For such other and further relief as may be appropriate and authorized by law.

Plaintiff/ Relator further prays that she be awarded an appropriate percentage of the amount recovered by and for the United States as a result of this action, together with statutory expenses, plus reasonable attorneys' fees and costs, in accordance with 31 U.S.C. § 3730(d).

## DEMAND FOR JURY TRIAL

Plaintiff/ Relator Roseanne Wholey, demands that this case be tried before a jury.

Respectfully submitted,

DATE:  OCTOBER 22, 2013

_____
Andrew M. Stone, Esq.
(Pa. #35176)
STONE LAW FIRM, LLC
1806 Frick Bldg., 437 Grant Street.
Pittsburgh, Pa. 15219
Phone: (412) 391-2005
Fax: (412) 391-0853
astone@stone-law-firm.com

ATTORNEYS FOR PLAINTIFF